told him to have Mahar sign his name at the bottom so as to leave room to make out a note on each page just above the signature, and the witness points to certain marks indicating where he was to tell Mahar to sign his name. The witness John M. Devore, called for the plaintiff, testified that he saw Mahar sign the notes at Auburn prison in the finishing shop at the desk. He says a convict by the name of Johnson came in there with him, and asked him to write a note. He says he drew the notes at the request of Mahar. He further testifies that he supposes that Johnson took the notes away with him. This witness denies all conversation with Scanlan about the notes. Devore testified that the two notes were written upon the same page of the half-sheet of legal cap. In this he positively contradicts, as in other matters, the statement of Scanlan, and this contradiction is, perhaps, the most controlling circumstance in the case touching the credibility of these two men. Scanlan, confessedly, was a man without character, but he has narrated the events as he says they occurred in the prison with apparent truthfulness. When these notes were produced and examined, it was found that the signature was in fact at the bottom of the two half-sheets, and were not made both upon the same page, one near the bottom, and the other higher up upon the page. The lower edge of each paper, it is stated in the case, (and the jury had the exhibits before them,) appeared, not as it would be if torn off below the signature at the time of its execution, but rather as originally cut by the manufacturers. This evidence made a case which was required to be submitted to the jury upon the question of forgery. If Mahar's signature was obtained in the manner related by Scanlan, the transaction was clearly a forgery, because the signature was obtained, not under mere pretense that he was signing a promissory note to be used for one purpose, but under the pretense that it was a petition only, and not in any respect an obligation for him to pay. The jury was justified in reaching its conclusion. The whole case shows that there was good ground for them to believe that there was a conspiracy to obtain from Mahar, without consideration, and without his knowledge, commercial paper, purporting to be executed by him, of just about the value of his entire estate. The jury might also, under the testimony, have reached a conclusion favorable to the defendant upon the other branch of the case, namely, that the plaintiff himself was not a *bona fide* holder for value of either of these notes. But it is hardly necessary to go into that branch of the case, inasmuch as we are well satisfied that the jury reached the correct conclusion upon the question of fact above mentioned, and that there was no exception to the evidence or the charge relating to this subject which is available to the plaintiff on this appeal. Neither of the pretended notes ever had a legal inception, and the judgment and order appealed from should, therefore, be affirmed. All concur.

---

### Kokomo Straw Board Co. *v.* Inman *et al.*

(*Supreme Court, General Term, First Department.*   October 24, 1890.)

1. Assumpsit—When Lies—Partly Performed Contract.

Plaintiff contracted to furnish to defendants a specified quantity of goods manufactured by plaintiff, for which defendants were to give their acceptances, the goods to be shipped during the year following. For several months of that year, plaintiff furnished the goods, and defendants gave therefor acceptances or notes, until, upon one of the notes becoming due, and not being paid, plaintiff refused to send more goods, and defendants then refused to give notes for shipments that had been made, and failed to pay notes that matured afterwards. *Held* that, in the absence of any default on plaintiff's part which could excuse defendants' non-payment, plaintiff could maintain an action against them for the value of the goods delivered.

2. Contracts—Performance—Rescission.

On November 9, 1887, plaintiff agreed in writing to furnish to defendants 1,200 tons of straw board, to be shipped during the year 1888. Defendants knew when making the contract that plaintiff's mill for making the straw board was not to be

completed for some time. It was completed late in December, 1887, and thereafter plaintiff furnished straw board, as required by defendants, until July, 1888, when orders for 438 tons had been given, and 433 tons had been delivered. Defendants then made default in payment, whereupon plaintiff refused further to carry out the contract. Defendants alleged that, at the date of the contract, they had ordered verbally 100 tons which plaintiff had not delivered; but this was denied by plaintiff. *Held,* that defendants were not justified in treating the contract as rescinded at the time of their own default.

3. ASSUMPSIT—GOODS SOLD AND DELIVERED—AMOUNT OF RECOVERY.

Under a contract by plaintiff to furnish to defendants a certain quantity of goods at a fixed price, plaintiff delivered part of the goods as required by defendants, and accepted defendants' notes for the price thereof, some of which were paid; but, on defendants' failure to pay one of the notes, plaintiff refused further to carry out the contract, and brought suit against defendants for the value of the goods delivered. *Held,* that the recovery therein should not be for more than the contract price.

Appeal from judgment on report of referee.

Action by Kokomo Straw Board Company against Horace Inman and Harry A. Inman for the value of goods sold and delivered. The issues were referred to John E. Ward, Esq., who found for plaintiff, filing the following opinion:

"The facts in this case may be briefly stated as follows: On the 9th of November, 1887, the defendant Horace Inman, representing his firm, the defendants in this case, entered into a written contract with the plaintiff in the words following: ‘KOKOMO, IND., Nov. 9th, 1887.

" ‘*Horace Inman, Esq., Amsterdam, N. Y.,*—DEAR SIR: We propose to furnish you with twelve hundred tons straw board, at thirty-one dollars per ton f. o. b. cars here, your ninety days' acceptance from date of invoice; these boards to be shipped during the year 1888. This contract shall be considered binding, barring accidents, and take the place of all previous contracts with the Ohio Straw Board Company. All boards to be of No. 1 quality.

‘Yours, truly,          KOKOMO STRAW BOARD COMPANY,
                                " ‘M. SEIBERLING, Superintendent.

" ‘Accepted: HORACE INMAN.

" ‘P. S. All boards shipped this year to apply on above.'

"At the time this contract was made, the plaintiff, the Kokomo Straw Board Company, was a corporation created by and existing under the laws of Indiana, its business being or intended to be the manufacture of straw board. Its mill was not completed at the time of the contract, and was not completed until the last week in December thereafter. The defendants were the manufacturers of paper boxes, and the owners of several factories, and largely interested in others, and were using about 1,200 tons of straw board at their various factories during the year. The plaintiff, as soon as its mill was completed, commenced to carry out its part of the contract by furnishing boards as required from time to time to the defendants, and the defendants carried out their part of the contract by giving acceptances, or notes accepted by the plaintiff in lieu of acceptances, until about the 5th day of July, 1888, when the note which then became due went to protest, and after such protest the plaintiff, with one exception hereafter to be noticed, refused to send any boards to the defendants, or further to carry out its contract, and the defendants refused to give any notes for shipments thereafter received. After various efforts for a settlement between the parties, all efforts of further negotiation were broken off, and the plaintiff on or about the 26th day of December, 1888, commenced an action in this court against the defendants for the alleged value of the straw board delivered to them in the various shipments. At the time of the commencement of this action, six notes that had been given by the defendants to the plaintiff had gone to protest. The action is not founded either upon the notes or the contract, but is an action for the value of goods sold and delivered.

" Three questions present themselves for consideration:  *First.*  Under the facts of this case, as they have been briefly stated, but as they will be hereafter more fully considered under each point, can this form of action be maintained by the plaintiff against the defendants?  *Second.*  If this question is answered in the affirmative, has the plaintiff so violated or departed from its contract as to deprive it of the right of action, or to give the defendants a right of counter-claim for damages against it?  *Third.*  If the plaintiff is entitled to recover, for what amount should judgment be rendered in its behalf? Examining these questions in the order as they are presented, there can be no doubt, under the decisions of the courts of this state, and under the general law, that the plaintiff had the right to bring the action in this form. Where the contract, though partly performed, has been either abandoned by mutual consent or rescinded and extinct by some act on the part of the defendant, the plaintiff may resort to the common counts alone for remuneration for what he has done under a special agreement.'  2 Greenl. Ev. p. 87, § 104.  In the case of *Ladue* v. *Seymour*, 24 Wend. 62, the court says:  'When an end has been put to the contract by the wrongful act of the party for whom the services were rendered, the other party may, in general, resort to the *indebitatus assumpsit* count, and in that form recover for his labor and materials.'  In the case of *Jones* v. *Judd*, 4 N. Y. 414, the court say: 'If the performance had been arrested by the act or omission of the defendants, the plaintiff would have his election to treat the contract as rescinded, and recover on a *quantum meruit* the value of his labor.'

"The simple question then arises, do the facts in this case bring the plaintiff within the provisions of the above-stated principle?  There is no dispute about the facts that one of the notes of the defendants, the note which became due on the 5th of July, 1888, was not met at maturity, and was allowed to go to protest.  Subsequent notes shared the same fate.  It is true that the defendants seek to relieve themselves of the obligation to pay these notes by the allegation that the plaintiff had not complied with its part of the agreement.  That question I will examine under the second legal proposition. Assuming that it had substantially performed its contract, there can be no doubt in my mind that the non-payment of the demands of the plaintiff as they matured under the contract, and the failure of the defendants to give notes for the subsequent shipments made in June, authorized the plaintiff to set aside the contract, and to declare it at an end, and to furnish no other boards.  It cannot for a moment be assumed that the plaintiff was bound to go on furnishing its materials under the contract, unless the defendants complied with their portion of the contract, and paid for the materials according to the requirements of the contract.  In the correspondence of the defendants at the time when these notes went to protest, and immediately thereafter, there is no pretense of any excuse having been furnished them by the plaintiff for their non-payment.  On the contrary, on the day when the note became due, and went to protest, we find Mr. Inman, the defendant, writing to the plaintiff as follows:  'Your telegram in reference to my note ($1,054) was received to-day, too late to be of the slightest service to me.  My payments are very heavy, and I had hoped for some relief from you; therefore, I was obliged to let the note go back, which I regret very much.'  On the 24th of July, after two notes had gone to protest, the defendants wrote to the plaintiffs:  'I am very sorry that severe disappointments to me should have inconvenienced you also, but I anticipate no further trouble in the future. Will mail you notes for the unsettled accounts in a day or two.'  It thus appears that the defendants at that time, instead of finding an excuse for the non-payment of the note in default of the plaintiff, had actually applied to the plaintiff for assistance, and the plaintiff had even been willing to give them assistance, but it had come too late; and after all the transactions had been completed, and all the boards had been delivered except one ton, which was

delivered in August to oblige the defendants, the defendants admitted their indebtedness to the plaintiff for the boards which had been delivered, expressing their regrets that the notes given had not been paid, and their determination in a day or two to give notes for the unsettled account. Mr. Inman was asked by his counsel why that note was not paid. His answer was: 'It was not paid for two reasons. One was that I asked them to renew it, and I got no reply from them whether they would or not until after it was protested; and the second reason was because I had paid out a large amount of money for that same material that was due from them, therefore I was short of funds just at that time;' and the same reason is given for the non-payment of the notes which became due July 20th. On the 20th of July, 15 days thereafter, another note went to protest for the sum of $658.75, and no notes or acceptances were ever given for any shipments after the month of May. In my opinion, therefore, the plaintiff had the undoubted right to send no more boards, and to terminate the contract, unless, as is intimated by a portion of the answer of Mr. Inman, they were placed in this position by the failure of the plaintiff to furnish the board required; and we are thus brought to the consideration of the second legal proposition, to-wit: Has the plaintiff so violated or departed from its contract as to deprive it of the right of action, or to give the defendants a right of counter-claim for damages against it? What was the contract between the plaintiff and defendants? It was to furnish during the year 1888, 1,200 tons of straw board. Its mill was not completed, and was not to be completed, for some time after the date of the contract, and this was perfectly well known to the defendants when they made their contract. The contract as it is written ought to receive a reasonable interpretation, and such as will be just and equitable to both parties, neither giving the plaintiff the right to send the whole 1,200 tons during the last month of the year, as has been contended for by the plaintiff, nor authorizing the defendants to require 1,200 tons in any one month of the year, or in any two or three months of the year. The natural presumption is that the defendants would require, during the year 1888, 1,200 tons, an average of about 100 tons per month, sometimes a few more, and sometimes a few less, as expressed by Mr. Williams, the witness. An effort has been made on the part of the defendant to show by parol testimony some other agreement, or to give some other interpretation to this contract, but the parties, having reduced the contract to writing, must abide by it, and parol testimony of the surrounding circumstances, or of what took place at the time, can only be received for the purpose of giving what was the understanding of the contract at the time by the contracting parties. This principle should be peculiarly recognized in this case, because Mr. Inman, the defendant, says, in detailing this conversation: 'I said this ought to be put in the contract, and they said that the amount would vary, and I could have it as fast as I needed it.' Now, did the plaintiff comply with its portion of the contract as written or even as interpreted by Mr. Inman himself? Were the defendants practically furnished with boards as fast as they were required by them, or as fast as orders were sent? Mr. Williams testifies that 'the number of tons ordered up to the time the default took place in the payment of the note was 438, and the number of tons shipped during that period was 433 in round numbers;' and that he received no verbal order from the defendants between the date of the contract and the 1st of July, 1888. He was asked: 'Do you know whether the defendants or either of them gave the plaintiff any orders between November 9, 1887, and July 1, 1888, for straw board under the contract, which are not in writing? *Answer.* Do you mean that outside of the written orders we have that there is any order to correspond with the verbal order? No, sir; we received none. *Question.* You are sure of that? *A.* Yes, sir. *Q.* You know that of your own knowledge? *A.* Yes, sir; I know it.'

"There was therefore, according to the testimony of Mr. Williams, not more than five tons ordered by the defendants which had not been shipped. This testimony is confirmed by the defendants if we exclude 100 tons which they allege they ordered verbally on the 9th of November, and which Mr. Williams positively contradicts, as we have seen. Assuming for a moment that this order of 100 tons had been verbally given in November, did it justify the defendants in receiving the boards from the plaintiff from that time for the next six months, and then making default in the payment of their note given for boards which they had actually received and used? In the case of *Dubois* v. *Canal Co.*, 4 Wend. 289, the court says: 'Every breach of a special agreement by one party does not authorize the other party to treat it as rescinded. There are some breaches that do amount to an abandoment of it.' My opinion is, first, that this discrepancy between the amount ordered and the amount sent would not have justified the defendants in considering the contract rescinded at the time when their note became due and went to protest; but, if it even authorized a rescission, it was the duty of the defendants to have acted immediately. In the case of *Lawrence* v. *Dale*, 3 Johns. Ch. 23, 43, Chancellor KENT lays down the rule: 'If the law allows the party to abandon a contract while *in fieri*, he ought at least to act promptly and decidedly on the very first discovery of the breach. If he negotiates with the party afterwards, and permits the work to go on, he certainly waives all right to abandonment. There is not a case to contradict this doctrine, which is founded upon the plainest principles of justice.' On the 28th of May, more than six months after this alleged order is said to have been given, during which time other orders were being given and boards sent forward, the defendants write the plaintiff: 'As we have now a way in which we can keep orders straight, we wish you would cancel all former orders except those made on these blanks, and then we will know just what we have ordered.' Would it be possible for a jury or a referee, with the evidence of this case before them, to find as a fact that this 100 tons alleged by Mr. Inman to have been ordered were ordered on the 9th of November at the time when the contract was made? It must be remembered that the mill was not completed at the time when this order is alleged to have been given; that there is no absolute right given to the defendants by the contract to order any boards before the beginning of 1888, and the first time, in the correspondence or in the communication of these parties, when anything is heard of this alleged order of 100 tons of November 9th, is when Mr. Inman is upon the stand as a witness in the trial of this cause. Mr. Inman is there asked: 'When did you give your first order to the plaintiff for straw board under the contract in evidence? *Answer*. At the same day after the contract was signed,—on November 9th. *Question*. November 9th? *A*. Yes, sir; for 100 tons of straw board.' He is again asked: 'I wish to ask you again, how many tons were ordered between the 9th of November and the 1st of February? *Answer*. I ordered from the Kokomo Straw Board Company between that time and the 1st of February 170 tons. *Question*. That was 100 tons verbally, and 70 tons by written orders; two written orders? *A*. Yes, sir. Now, we seek in vain for any reference to such an order in the correspondence, or anywhere else except in this testimony, or any allusion whatever to it. On the 25th of November, after Mr. Inman returned to Amsterdam, he gave the following orders: 'AMSTERDAM, N. Y. Nov. 25, 1887. 'We also inclose order for boards, which we would like to have sent just so soon as you get to making good boards.'

"This was an order for 60 tons, and would hardly have been given in the form it was if the defendants knew that there was an outstanding order unfilled for 100 tons given verbally on the 9th of November, without any allusion to that order. On the 7th of December, after the above order had been given, the defendant wrote the plaintiff: 'Is there not some way you can let me have a car-load or two right away, even if not quite up to the standard,

we won't find any fault. As a matter of accommodation I wish you would make the effort. Rush it right along.' No allusion whatever made to the alleged verbal order on the 9th of November. On the 2d of January, 1888, the defendants again wrote: 'Please hurry boards along as fast as possible in accordance with orders sent you.' No allusion whatever to any order given, but to orders sent. On the 12th of January the defendants wrote: 'As to the first lot of board which you sent us, which we have received, we are very much pleased with it, being the first made by you. If you can steadily improve for three months, you will make the best board in the country.' No allusion to the unfilled order of the 9th of November, but another order sent for 10 tons with this request: 'Please make and send to us at once in advance of other orders.' And so new orders are given by the defendants to the plaintiff from time to time up to the 28th day of May, 1888, when, as we have seen, the plaintiff was requested by the defendants to cancel all orders previously given. Even after the note had gone to protest on the 5th of July, 1888, the defendants, so far from making any allusion to unfilled orders, or any claim for damages against the plaintiff, write: 'I was obliged to let the note go back, which I regret very much.' The defendant was asked in his examination, 'How many tons were ordered by you under the contract between the 9th of November, 1887, and July 1, 1888?' and he answers, 'Five hundred and thirty-three tons.' He is then asked, 'Does that include the 100 tons ordered on November 29th?' and he answers, 'Yes,' *Question.* 'How many tons did you order in July and August under the contract?' and he answers, 'One hundred and forty-three tons.' On the 27th of August the defendants wrote the plaintiff as follows: 'Now, the situation is this: You have 150 tons of old orders on your books not yet filled.' This, of course, must have included the order for the 143 tons which the defendant has testified that he gave the plaintiff in the months of July and August; for those months only 1 ton was sent. Now, if we deduct 143 tons or 142 tons from the 150 tons which the defendants allege was still due them, it excludes any pretext of the 100 tons alleged to have been ordered in November, and leaves an order for only 8 tons unfilled at that time; and the defendants allege further in the same letter that there was due them about 700 tons on their contract with only four months to deliver it in, showing conclusively, according to the construction of the defendants themselves, that the plaintiff had the year within which to complete the entire contract, and, if 700 tons were due them, 500 must have been delivered; and, as there were no deliveries after the 1st of July except 1 ton in August, the plaintiff must necessarily have delivered 500 tons or about that number in five months, which would have been a literal compliance with the contract. On the 28th of August, 1888, the defendants wrote the plaintiffs ordering 15 tons of board, and that letter says: 'We inclose a statement of straw board ordered and received since May 14th, which shows a balance of 133 tons still due us on back orders, not considering the order of to-day.' That order for 15 tons added to the order of 135 tons would of course make 150 tons due on the back orders of the defendants on the 28th of August, 1888. The defendant, as we have seen, upon his examination, was asked: 'How many tons did you order from the plaintiff in July and August under the contract?' and he answered, 'One hundred and forty-three tons.' Deducting from the 150 tons which the defendants allege were due them on previous orders on the 28th of August, the 143 tons which in their testimony the defendants say were ordered during the months of July and August, the conclusion is irresistible that, at the time when the first note was allowed to go to protest, his orders had all been filled, except that the number of tons previously stated by Mr. Williams had not been filled, to-wit, about six or seven tons; and it must be remembered that, by the undisputed testimony, from the 29th of May, inclusive, to the 5th of July, when the note was protested, a period of a little more than one month, orders had been given for 170 tons,

and during the same period the defendants had received from the plaintiff more than 122 tons, and after these orders had been given, and the material received, as late as August 11th, the defendants did not pretend to make any claim for damages, or that the notes were not paid because of any violation of the contract on the part of the plaintiff, but wrote as follows: ' I now hand you my check for $558 in payment of the note which I learn has gone back, and will forward check for expenses as soon as informed of the amount. This time the fault should not be charged to me, but I regret the occasion for it. The bank should certainly have notified my office the same day, and, while it would not have altered the result, still you would not have been misinformed.' Having thus come to the conclusion that the plaintiff is entitled to a judgment, the only question remaining to be considered is for what amount that judgment should be rendered.

"The plaintiff seeks a judgment for a price far beyond the contract price, upon the ground that, the contract having been set aside, he is entitled to the value of the straw board, without reference to the contract; although the contract has been set aside by the plaintiff to enable him to bring the action, it still remains as a rule of damages, and the price fixed by the parties themselves at which these boards were to be furnished is the best evidence of value that can possibly be given. Besides, it must be remembered that, during the whole correspondence, the plaintiff expressed itself as willing and able and even anxious to carry out the contract at the price agreed upon, if that price was only paid, and for much the largest amount in dispute the defendants had given to the plaintiff, and the plaintiff had accepted, notes, and most of the notes had been paid, and the contract to that extent entirely closed. In cases where, notwithstanding the breach of a special contract, the party in fault can still recover upon a *quantum meruit*, the special contract is sometimes competent evidence upon the question of what the services are reasonably worth. 2 Greenl. Ev. 88, note *c*. In the case of *Clark* v. *Gilbert*, 32 Barb. 582, in delivering the opinion of the court, it is said: 'The contract or agreement of the parties is competent evidence, and, when the compensation is so fixed and regulated by the contract that it can be apportioned without injustice to either party, the compensation agreed upon may well be taken as that which the party reasonably deserves to receive.' The defendants admit the receipt of 430 tons at $31 per ton. This would amount to $13,330. The plaintiff in his complaint admits the receipt from the defendants of $7,328.40, which would leave a balance due the plaintiff from the defendants of $6,001.60. There is a discrepancy between this testimony and the testimony of Mr. Williams of only three or four tons. The number of tons shown by the amount of the five unpaid notes to have been received, and the amount received in June and August for which no notes were given, confirms, in my judgment, the testimony of Mr. Williams, and I have so found in my report. I have been forced to the foregoing conclusions by the testimony in this cause, notwithstanding the many defenses so ingeniously set up by counsel for the defendants, and the great ability with which they have been pressed upon me."

Judgment for plaintiff was entered on the report. From the judgment defendants appeal.

Argued before VAN BRUNT, P. J., and BRADY and DANIELS, JJ.

*Smith & White*, for appellants. *William Ford Upson*, for respondent.

PER CURIAM. We think that the judgment appealed from should be affirmed, upon the opinion of the referee.